**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**RODNEY RUCKER**                                                         **PLAINTIFF**

**VS.**                                                    **CAUSE NO.:** 3:22cv113-MPM-JMV

**CITY OF SENATOBIA, MISSISSIPPI,
JAMES MARSHALL, "JOHN" JOHNSON, AND
WILLIAM CARTER**

---

**COMPLAINT**

---

Comes now, Plaintiff Rodney Rucker, through counsel, and files this Complaint for damages arising from violation of his rights under the Constitution of the United States of America, pursuant to 42 U.S.C. §§ 1983 and 1988, and would state to the Court as follows:

I. PARTIES

1.     Plaintiff Rodney Rucker is an adult resident (hereinafter, "Mr. Rucker") of Tate County, Mississippi.

2.     Defendant City of Senatobia, Mississippi, (hereinafter, "The City") is a municipality of the State of Mississippi, which can be served through its mayor, Greg Graves at 133 North Front Street, Senatobia, Mississippi, 38668.

3.     Defendant James Marshall (hereinafter, "Defendant Marshall"), upon information and belief, is an adult resident of Tate County, Mississippi. At all times relevant, Defendant Marshall was an officer of the Senatobia, Mississippi, Police Department, acting under color of state law.

4. Defendant "John"[1] Johnson (hereinafter, "Defendant Johnson"), upon information and belief, is an adult resident of Tate County, Mississippi. At all times relevant, Defendant Johnson was an officer of the Senatobia, Mississippi, Police Department, acting under color of state law.

5. Defendant William[2] Carter (hereinafter, "Defendant Carter"), upon information and belief, is an adult resident of Tate County, Mississippi. At all times relevant, Defendant Carter was an officer of the Senatobia, Mississippi, Police Department, acting under color of state law.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a), as the subject matter arises under federal law and claims are brought pursuant to 42 U.S.C. § 1983 and 1988.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred within this judicial district.

## III. FACTUAL ALLEGATIONS

8. On February 12, 2021, Plaintiff, then a 34-year-old, African American male, was sitting in his running vehicle in a parking space outside the Dreamland Inn and Suites in Senatobia, Tate County, Mississippi.

---

[1] Plaintiff, at the time of this filing, is unaware of the first name of Defendant Johnson, as Defendant Johnson is only identified by his last name in the documents in Plaintiff's possession. Plaintiff will amend his complaint once the first name of Defendant Johnson has been discovered.

[2] Plaintiff, at the time of this filing, has a good faith belief that "William" is the first name of Defendant Carter. If it is discovered that "William" is not the first name of Defendant Carter, Plaintiff will amend his complaint once the true first name of Defendant Carter is discovered.

9.      Plaintiff had spent the night at the hotel and was preparing to go to work at McDonalds.  He was wearing his McDonalds work uniform.

10.     The weather was very cold, so Plaintiff was allowing his vehicle to warm before driving.

11.     Without Plaintiff having committed any criminal offense or having exhibited any conduct indicative of criminal behavior, Defendant Marshall approached Plaintiff's car, effectively seizing him, and beginning what Defendant Marshall would eventually call an "investigation" which was wholly unsupported by probable cause or reasonable suspicion.[3]

12.     Defendant Marshall began his seizure of Plaintiff by telling him that he was "getting out with him" because Plaintiff had been "sitting [t]here a while" and the area is a "high area" for "narcotics, prostitution, and stuff like that."[4]

13.     Obviously confused as to why he was being approached by a police officer, Plaintiff asked Defendant Marshall "who told you that? who called?"[5]

14.     Defendant Marshall confirmed that no one had called to report any behavior on Plaintiff's part whatsoever and that the decision to seize Plaintiff was his own, as Defendant Marshall was "just patrolling" when he made the decision to seize Plaintiff.

15.     Defendant Marshall told Plaintiff that the reason for the stop was to make sure everything was "on the up and up" and to confirm that Plaintiff had a room at the hotel.[6]

16.     Plaintiff confirmed to Defendant Marshall that he did in fact have a room at the hotel and provided him with the room number.[7]

---

[3] The interaction between Plaintiff and Defendant Marshall was caught on Defendant Marshall's body camera, and that video is attached hereto as Exhibit A. Plaintiff will reference the time stamps when citing to the officers' video.
[4] Exhibit A, 0:00-0:15.
[5] Exhibit A, 0:15-0:20.
[6] Exhibit A, 0:33-0:36.

17.     Defendant Marshall then asked Plaintiff to provide his ID.[8]

18.     Plaintiff told Defendant Marshall that he did not have an ID on him.[9]

19.     Defendant Marshall then asked for Plaintiff's social security number and told him "I just got to advise dispatch who I'm talking to."[10]

20.     Plaintiff told Defendant Marshall he did not know his social security number.[11]

21.     Defendant Marshall then asked Plaintiff for his name.[12]

22.     Plaintiff provided his first name to Defendant Marshall.[13]

23.     Defendant Marshall then requested Plaintiff's date of birth.[14]

24.     Plaintiff then asked Defendant Marshall for what reason was he being asked for this information.[15]

25.     Without answering the question, Defendant Marshall then asked for Plaintiff's last name.[16]

26.     Plaintiff asked again what the reason was for the investigation, and Defendant Marshall then told Plaintiff, "I just told you."[17]

27.     Plaintiff then explained to Defendant Marshall that he was going to work and had just come out and told him there was no reason for the investigatory stop.[18]

---

[7] Exhibit A, 0:36-0:41.
[8] Exhibit A, 0:41-45.
[9] Exhibit A, 0:48-0:50.
[10] Exhibit A, 0:57-1:01.
[11] Exhibit A, 1:01-1:03.
[12] Exhibit A, 1:03-1:04.
[13] Exhibit A, 1:05-1:10.
[14] Exhibit A, 1:10-1:11.
[15] Exhibit A, 1:11-1:13.
[16] Exhibit A, 1:14-1:15.
[17] Exhibit A, 1:16-1:17.
[18] Exhibit A, 1:18-1:24.

28.     Defendant Marshall then indicated that Senatobia police officers conduct investigatory stops when they "see people sitting in their vehicles," indicating a policy, practice, or custom within the City of Senatobia Police Department of conducting unreasonable seizures, unsupported by probable cause.[19]

29.     Plaintiff then asked Defendant Marshall, "You know it's cold, right?" and told Defendant Marshall that he was warming up his vehicle.[20]

30.     After some back and forth conversation, Plaintiff asked whether anyone was in the hotel office. Defendant Marshall told him that the manager was in the office, and Plaintiff told Defendant Marshall he needed to go ask the manager.[21]  Had Marshall simply inquired with the hotel manager, he would have learned that Plaintiff was, in fact, lawfully staying at the hotel.

31.     Plaintiff then told Defendant Marshall, "I really don't got to identify myself."[22]

32.     Defendant Marshall then told Plaintiff that he had to identity himself because he was part of an investigation.[23]

33.     Plaintiff told Defendant Marshall that he was not a part of an investigation.[24]

34.     Defendant Marshall then told Plaintiff to open his car door; Plaintiff refused; and Defendant Marshall then told Plaintiff, "You can open that door, or I'm going to get you out."[25]

35.     Plaintiff still refused to open his car door, telling Defendant Marshall, "Because you're violating me already. You were violating me when you first come up here. I didn't do nothing."[26]

---

[19] Exhibit A, 1:35-1:41.
[20] Exhibit A, 1:41-1:45. The video itself shows that it was cold as Plaintiff's breath can be seen.
[21] Exhibit A, 2:31-2:36.
[22] Exhibit A, 2:36-2:39.
[23] Exhibit A, 2:39-2:42.
[24] Exhibit A, 2:43-2:44.
[25] Exhibit A, 2:45-2:51.

36. Defendant Marshall again told Plaintiff to open his door, and Plaintiff told Defendant Marshall that there was no reason for him to be required to open the door and that he was not a part of an investigation and that he should take it up with the hotel manager.[27]

37. After some back and forth argument, Defendant Marshall called another officer, Defendant Carter, over to Plaintiff's car window and said, "You've been sitting here, right? He still has to identify himself. Look at the white powder on his nose. Plus he had white powder on his pants."[28]

38. Plaintiff was visibly surprised by the allegation that he had white powder anywhere on him.

39. Defendant Marshall asked Plaintiff, "Am I mistaken?" to which Plaintiff replied, "Yes, sir."[29]

40. Plaintiff and Defendant Marshall continued to argue verbally, and Defendant Marshall called another officer on the radio saying, "head on this way".[30]

41. Defendant Marshall told Plaintiff, "If you don't get out, it's going to go badly," indicating an intent to use physical force against Plaintiff.[31]

42. Defendant Marshall yelled to another officer, "He's stating he don't have to identify himself," to which Plaintiff replied, "You don't know me."[32]

---

[26] Exhibit A, 2:55-3:00.
[27] Exhibit A, 3:00-3:17.
[28] Exhibit A, 3:25-3:31. The video is clear, and there is no white powder at all visible on Plaintiff, and no white powder, drugs of any kind, or paraphernalia were found on Plaintiff's person or inside Plaintiff's car after being fully searched by Senatobia police officers.
[29] Exhibit A, 3:36-3:39.
[30] Exhibit A, 3:40-4:15. It is believed that Defendant Marshall was calling for Defendant Johnson to come to the scene, as Defendant Johnson is the officer who arrived next.
[31] Exhibit A, 4:48-4:50.
[32] Exhibit A, 5:16-5:20.

43. Then, Defendant Marshall escalated an already tense situation by childishly goading Plaintiff into a back and forth verbal argument and then asking, "Are you fucking threatening me?" when Plaintiff clearly was not threatening Defendant Marshall in any way.[33]

44. Defendant Johnson arrived on the scene, and immediately began striking Plaintiff's driver window, causing it to shatter.[34]

45. Defendant Carter, who was also on the scene prior to Defendant Johnson's arrival, was also wearing a body camera.[35]

46. Defendant Carter had a conversation with someone, presumably a superior, either by phone or radio, and asked, "He says he won't get out of the vehicle. We got the right to bust the window, right?"[36]

47. Defendant Carter went on to tell the third person, "Okay. He's in the car with it running and won't get out of the car. And Marshall done asked him several times to step out. He pulled up on him at the motel and he's refusing to get out of the car, so as soon as Johnson gets here with that baton, that's what we'll do."[37]

48. In his description of the scene, Defendant Carter never verbalized any justification or reasonable suspicion for Defendant Marshall's initiating an investigatory stop on Plaintiff.

---

[33] Exhibit A, 5:21-6:00.
[34] Exhibit A, 6:45-6:52. It is not clear at all why Defendant Johnson and Defendant Marshall felt the need to shatter the driver window, as the door was clearly not locked and was simply opened from the outside by Defendant Marshall following the shattering of the window. This use of force was clearly unnecessary.
[35] The footage from Defendant Carter's body camera is attached hereto as Exhibit B.
[36] Exhibit B, 1:42-1:45. Upon information and belief, the person Carter was speaking to had the last name "Jenkins."
[37] Exhibit B, 1:54-2:13.

49. After concluding his conversation, Defendant Carter told Defendant Marshall, "Bust it out when Johnson gets here."[38]

50. A voice from the radio called out, indicating that the officers would need a baton to get in the window and that Defendant Johnson should "get there with the quickness."[39]

51. After his window was shattered by Defendant Johnson, Plaintiff stood up out of his vehicle.[40]

52. It is clear that Plaintiff did not kick at the officers, did not punch at the officers, did not attempt to anchor himself inside his vehicle, and did not actively resist getting out of his vehicle in any way.[41]

53. Regardless of the absence of any active resistance, Plaintiff was not simply turned around and placed in handcuffs, but instead was thrown to the pavement, where both Defendant Johnson and Defendant Marshall jumped on his back and Plaintiff's head was pushed into the pavement.[42]

54. Defendant Marshall completed a narrative incident report where he stated that he had to "pull [Plaintiff] from the vehicle" and that Plaintiff would not turn around and place his hands behind his back after being "told several times."[43]

55. These statements are clearly false as the video clearly shows that Plaintiff stood up from his vehicle and was then immediately taken to the ground without any prior verbal orders.

---

[38] Exhibit B, 2:47-2:48.
[39] Exhibit B, 2:48-2:53.
[40] Exhibit A, 6:52-6:55; Exhibit B, 3:35-3:37.
[41] Exhibit A, 6:52-6:55; Exhibit B, 3:35-3:37.
[42] Exhibit A, 6:58-7:16; Exhibit B, 3:38-4:04.
[43] Exhibit C, Marshall narrative.

56.     Again, Plaintiff offered no active resistance, even in the face of the use of force by Defendants Johnson and Marshall, and instead simply shielded his head from the assault and allowed the officers to place him in handcuffs.[44]

57.     Defendant Marshall noted that Plaintiff's cell phone was lying on the ground broken after his arrest and seemed to revel in the destruction of Plaintiff's property, saying, 'Oh, man, hate it for your phone, dude."[45]

58.     Following Plaintiff's placement into custody, Defendant Johnson can be seen laughing about the situation.[46]

59.     Defendant Marshall told Plaintiff, "You get one chance to say, anything in that car?" to which Plaintiff replied, "No, I'm good."[47]

60.     Defendant Marshall replied, "You good? You ain't going to say? That's cool. We're going to find it." Plaintiff told Defendant Marshall, "I ain't got anything."[48]

61.     Despite Defendant Marshall's baseless insistence that Plaintiff had white powder on his nose, and that they would "find something" in the vehicle, no drugs or any other type of illegal substance was found in Plaintiff's vehicle or on Plaintiff's person.

62.     Plaintiff was charged with disorderly conduct, resisting arrest, and DUI-1st offense.

63.     Plaintiff hired counsel to assist in his defense of the criminal charges. Subsequently, all criminal charges were dismissed in Plaintiff's favor.

---

[44] Exhibit A, 6:58-7:16; Exhibit B, 3:38-4:04.
[45] Exhibit A, 8:33-8:35.
[46] Exhibit B, 5:37-5:43.
[47] Exhibit A, 8:55-9:00.
[48] Exhibit A, 9:00-9:09.

IV. CAUSES OF ACTION

64.     Plaintiff's seizure and arrest by Defendant Marshall was unsupported by probable cause in violation of his rights under the Fourth Amendment to the Unites States Constitution.

65.     Plaintiff's arrest by Defendant Marshall was in direct retaliation for the exercise of his rights under the First Amendment to the United States Constitution to voice peaceful opposition to police action which was unsupported by probable cause and in violation of Plaintiff's constitutional rights.

66.     Plaintiff was subjected to the use of unnecessary and excessive force by Defendants Marshall and Johnson, resulting in substantial physical injuries, during the course of his arrest, in violation of his rights under the Fourth Amendment to the United States Constitution.

67.     Defendant Carter participated in and observed all conduct committed by Defendants Marshall and Johnson and did nothing to correct the course of behavior engaged in by Defendants Marshall and Johnson in order to protect Plaintiff from further violation of his constitutional rights.

68.     Plaintiff, an African American male, was treated differently and more harshly by Defendants Marshall, Carter and Johnson than similarly situated non-African Americans in violation of his right to equal protection under the Fourteenth Amendment to the Unites States Constitution.

69.     Defendant City of Senatobia has a pattern, policy, custom and/or practice of profiling African Americans within the city and subjecting them to unnecessary and excessive police conduct, unsupported by reasonable, articulable facts, and further, Defendant City of

Senatobia has engaged in negligent hiring, retention, and training, all of which acts as a moving force behind the constitutional violations suffered by Plaintiff.

70. As a direct and proximate result of the conduct of all defendants, as described herein above, Plaintiff suffered physical injuries, medical expenses, damage to reputation, fear, embarrassment, and incidental out-of-pocket expenses related to his arrest and prosecution.

71. Plaintiff is entitled to recover compensatory damages under 42 U.S.C. § 1983.

72. Plaintiff is entitled to recover punitive damages against the individual officers pursuant to 42 U.S.C. § 1983.

73. Plaintiff is entitled to recover attorney fees and expenses associated with the prosecution of this claim pursuant to 42 U.S.C. § 1988.

## V. REQUEST FOR RELIEF

Wherefore, premises considered, Plaintiff respectfully requests a trial by jury on all counts herein, judgment against Defendants for compensatory damages, judgment against the individual Defendants for punitive damages, attorney fees, costs, expenses, and interest. Plaintiff further requests any additional relief to which he is entitled under the circumstances.

Respectfully submitted,

BY:  s/ Brandon Flechas
BRANDON FLECHAS (MSB#102283)
PHILIP A. STROUD (MSB# 99401)
THE STROUD LAW FIRM, P.C.
5779 Getwell Road, Suite C-1
Southaven, MS 38672
Tel. (662)536-5656
Fax (662)536-5657
brandon@stroudlawyers.com
philip@stroudlawyers.com
Attorneys for Plaintiff