IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MISSISSIPPI

OXFORD DIVISION

_____

RODNEY RUCKER,                    )
                                  )
                                  )
        Plaintiff,                )
                                  )
VS.                               )    NO. 3:22-CV-00113-MPM-JMV
                                  )
                                  )
CITY OF SENATOBIA, ET AL.,        )
                                  )
                                  )
        Defendants.               )


_____

30(B)(6) DEPOSITION

OF

MATTHEW DEFORE

FEBRUARY 9, 2023


ALPHA REPORTING CORPORATION-A VERITEXT COMPANY

236 Adams Avenue

Memphis, TN 38103

901-523-8974

www.veritext.com

Page 1

Exhibit "S"

A. Yes, sir.

Q. It says, Rodney Rucker filed a complaint after he was arrested on February 12th, 2021 alleging that his arrest was improper, the search of his vehicle was improper and that the -- that improper force was used.

Do you see that?

A. I do.

Q. There's actually more as we discussed that he complained about, but those aren't -- those are the only things you considered, correct?

A. That -- that's what we're speaking to in this dispo- -- disposition.

Q. Right. You say, Officer Marshall engaged Mr. Rucker after observing at least three articulable facts of suspicious behavior.

Do you see that?

A. I do.

Q. What are the three facts that you are referring to?

A. So the time of night. You could dissect it as follows: The time of night, the location being that it's high crime, the fact that it's a local tag at this high-crime location that is a hotel, and we all know what the common use for a hotel is as far as any hotel and --

Q. What's -- what is the common use of any hotel?

Page 47

A. To book a room and stay in it --

Q. Okay.

A. -- such as if you're traveling or something like that. So we're at time of night, high-crime area, local tag, length of time, loitering at a high-crime area at night as a local resident and certainly the substance on the nose.

Q. All right. This sentence says, Officer Marshall engaged Mr. Rucker after observing at least three articulable facts of suspicious behavior.

A. Uh-huh (affirmative response).

Q. You would agree with me that when -- if he's observing things prior to engaging him, the substance on the nose is not included in one of those articulable facts.

A. It would depend on when the seizure occurred, and one of the things I looked at was, was this an immediate seizure or not.

Q. I want to address it first Officer Marsh- -- what your investigation found with regard to Officer Marshall's reasoning for approaching the vehicle, and --

A. Uh-huh (affirmative response).

Q. -- we'll -- we'll break down this as we go.

A. Okay.

Q. But am I to understand this sentence that Officer

Page 48

Q.   Okay.  Did Officer Marshall meet all of those requirements?

A.   Yes.  And I -- I understand there may have been a discrepancy in his memory of what his dates were.  The -- the documentation lines up that he -- he was hired on November of 20- -- 2020.  We had -- we're in possession of a copy of his Arkansas certificate at that time.  His BLEOST application is sent to the state contemporan- -- contemporaneous to his hire.  We received a response from BLEOST --

Q.   What does that stand for?

A.   I'm sorry.  Minimum standards of training out of Jackson -- standards in training from Jackson.  They're -- they're over the law enforcement certificates.  They responded to our application and said, yes.  You do have one year where he can work unsupervised, and his other prior certification will be recognized.

And before that window had ran, he had been sent to an accredited academy.  I believe it was DeSoto County, but I would -- for sure -- with certainty he was sent to one of the several options of academies that were available to us within that timeframe.

Q.   Did you hire Officer Marshall?

A.   I don't hire.

Q.   Okay.  Were you involved in the interviewing or

Page 87

Exhibit 6 to your deposition.

(WHEREUPON, THE ABOVE-MENTIONED DOCUMENT WAS MARKED AS EXHIBIT NO. 6 TO THE TESTIMONY OF THE WITNESS AND IS ATTACHED HERETO).

BY MR. STROUD:

Q. See if you recognize that.

A. (Examining document). Yes, sir. It looks like CAD -- CAD information of some type.

Q. Okay. Have you seen these documents before today?

A. Briefly.

Q. All right. I'm going to ask you to turn to DEF-00183.

A. Okay.

Q. This is a document that appears to be a report from Page 183 all the way to Page 199; is that correct?

A. (Examining document). (Short pause). Yes, sir.

Q. What is -- what is this report?

A. This looks like a -- a list of calls that have been entered for Dreamland Motel.

Q. Okay. Would these only be calls that came into dispatch from -- from citizens, or would this be every -- every call that went into dispatch whether -- from police cars as well?

A. I see a lot of citizen-initiated complaints.

Page 109

(Short pause). I see a lot of citizen-initiated complaints. It's hard to go beyond that based on what's written in here.

Q. Are you familiar with how this report is compiled and what -- what information it's intended to preserve?

A. I understand it comes from the CAD system.

Q. Okay. Have you seen these reports before in your work as assistant chief?

A. I -- yeah. I've used the CAD before, so, like, that's what I'm drawing from.

Q. I guess what I'm asking is: Is this something that actually -- somebody goes and takes information from a CAD and creates this report, or is this a report that can be created through the CAD system?

A. So it looks like a search function.

Q. Okay. Go to Page 187, if you would.

A. Okay.

Q. Let's start at the very bottom starting with February 4th, 2020 approximately one year before the incident involving Mr. Rucker.

A. Uh-huh (affirmative response).

Q. Educate me a little bit. I see the first column is obviously the date.

A. (Examining document). Okay.

Q. The next column appears to be the time, correct?

Page 110

A. A disturbance, I mean, it's some -- just a general definition of disturbance is something that somebody is complaining that there's a fight, an argument, some type of disturbance in the general sense. Non-domestic just means that from we know at the time of the call is it's not, you know, boyfriend/girlfriend, husband/wife. Although, a lot of times they -- non-domestic you arrive and find out that it's domestic.

Q. Got you.

A. So --

Q. And at the end of that it has the word, call closed.

What does that mean?

A. I believe they all say that, call closed. It just means that that was the -- if the call is open, then it's still happening, so it's still a live call. Dispatchers have still got officers on the scene. Officers are taking the actions, so it means that it's over.

Q. You can't tell by this report whether an arrest was made or whether someone is taken into custody, right?

A. No. Not from what I'm seeing here, no, sir.

Q. Okay. Going down from disturbance, non-domestic, and -- on this February 4th, 2020, underneath that the next call of February 9th, 2020 --

Page 113

A.   Uh-huh (affirmative response).

Q.   -- just take me through what these -- what these mean as far as dis- -- you know, disturbance non-domestic. The next one looks like, complain.  The next one looks like S-U-S-P-P-E-R-S.  I mean, just as we go down --

A.   Okay.

Q.   -- just tell me what those are.

A.   Complain, is complaint where the character got cut off on the limit, and that is just a generic dispatch call code.  A lot of times this uses a catch all.  We've actually been auditing those where we're finding that the dispatchers are being kind of lazy and just using that.

So that can be anything, in other words.  It just simply means that somebody has called the dispatch center and asked for a police response for anything from a barking dog to a violent crime.

Q.   Okay.  Go on down, if you would.

A.   That is suspicious person below that.

Q.   Okay.  We've covered those.  Go to the next page, if you would, 2/28/20, welfare.

A.   (Examining document).  Welfare check, anything from a person passed out to a suicidal type of call -- suicidal threat, medical concern.  It's just anything where there's a concern for someone's health or safety.

Q.   At the top of the page on the 2/17/20 line it

Page 114

Q.   Somebody had an accident in a parking lot or something?

A.   That could be one of the reasons you would get that.

Q.   Okay.  12/18, walk through, what is that?

A.   That's when an officer is walking through like I'm -- I'm going to walk through and -- as a patrol -- a foot patrol.

Q.   It would have been called in, though, to dispatch?

A.   No.  Not usually.  It's documented in the CAD. I'm not used to seeing it as a CAD entry.  That may be a new dispatcher that just did extra work and entered it that way.

Q.   Is that normal or is that kind of a -- a custom for the Senatobia Police Department to have officers just walk through the Dreamland Inn parking lot or what?

A.   They -- they --

MS. BLAND:  Object to the form.

A.   -- they deal with it throughout the city at different locations.

BY MR. STROUD:

Q.   Is this one of the worst locations for crime in the city?

A.   I wouldn't be able to rank it for you, but it's

Page 118

-- it's one of -- it's one of our locations that has more complaints associated with it.

Q. Okay. On all of these it says, no -- well, not all of them, but you see outside beside a lot of these it says, no report.

A. Uh-huh (affirmative response).

Q. What does that mean?

A. That the officer did not generate a written report after that.

Q. Okay. So if a -- is it -- what circumstances would an officer not generate a report?

A. An easy one would be if -- is if there was no arrest made --

Q. Okay.

A. -- or there was no -- no follow-up action needed to lead to an arrest, stuff like that.

Q. If there was evidence the police uncovered after being called to Dreamland of someone using narcotics or selling narcotics or any narcotic-related event, a report would be done, correct?

A. It would depend exactly on what, you know, we're talking about.

Q. Well, what circumstances would you not expect an officer to do a report when they discover narcotics?

A. So, yes. If they -- if they find narcotics,

Page 119

C E R T I F I C A T E

STATE OF MISSISSIPPI    )
                        )
COUNTY OF _____      )


I, Amy D. McCullough, CCR #1653, Certified Court Reporter, in and for the State of Mississippi do hereby certify that the above deposition was reported by me, and the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Mississippi Board of Certified Court Reporters and as a Certified Court Reporter as evidenced by the CCR number and expiration date following my name below.

I further certify that this transcript is the work product of this court reporting agency and any unauthorized reproduction and/or transfer of it will be in violation.

*Amy McCullough*
_____

AMY D. McCULLOUGH,
CCR #1653 (MS)
Expiration Date 12-31-23
ALPHA REPORTING
CORPORATION-A VERITEXT COMPANY
236 Adams Avenue
Memphis, Tennessee 38103

Page 140